We'll hear argument next — this morning in Case 12-416, the Federal Trade Commission v. Actavis. Mr. Stewart. Mr. Chief Justice, and may it please the Court, as a general matter, a payment from one business to another in exchange for the recipient's agreement not to compete is a paradigmatic antitrust violation. The question presented here is whether such a payment should be treated as lawful when it is encompassed within the settlement of a patent infringement suit. The answer to that question is no. Reverse payments to settle Hatch-Waxman suits are objectionable for the same reasons that payments not to compete are generally objectionable. They subvert the competitive process by giving generic manufacturers an incentive to accept a share of their rival's monopoly profits as a substitute for actual competition in the market. Scalia. Why are payments not to compete different from, let's say, dividing a market? I mean, suppose there's a lawsuit, somebody challenging the validity of the patent, and the patentee agrees to allow the person challenging the patent to have exclusive rights to sell. Does that violate the antitrust laws? I mean, there are really two differences between that scenario and the one presented here. The first is that an exclusive license is expressly authorized by the Patent Act. In Section 261 of Title 35. But the second thing is the second thing is that an exclusive license doesn't give the infringement defendant anything that it couldn't hope to achieve by prevailing in the lawsuit. That is, if the at least any right to compete that it wouldn't get by prevailing in the lawsuit. If the infringement defendant won, it would be able to sell wherever it wanted to. Now, there may be some. Scalia, in order to make money, I mean, that's what it wants, is money. So instead of giving the license to compete, you know, we'll short circuit the whole thing, here's the money, go away. But the point here is that the money is being given as a substitute for earning profits in a competitive marketplace. That is, in the Hatch-Waxman settlement context, by definition, we have a disagreement by parties as to the relative merits of the infringement and or validity questions as to the patent infringement suit. The brand name is saying its patent is valid and infringed. The generic is saying either that the patent is invalid or that its own conduct won't be infringing or both. And if the generic wins, it will be able to enter the market immediately. If the brand name wins, it will be able to keep the generic off until the patent expires. And so in that circumstance, a logical subject of compromise would be to agree upon an entry date in between those two end points, just as the parties to a damages action would be expected to settle the case by the defendant agreeing to pay a portion of the money it would have to pay if it lost. That's a natural subject of compromise. And we don't have a problem. Scalia. Mr. Stewart, do you have a case in which the patentee, acting within the scope of the patent, has nonetheless been held liable under the antitrust laws for something that it's done? Yes. Acting within the scope of the patent. Yes, if you adopt Respondent's conception of what it means to act within the scope of the patent, and let me explain. When Respondents say that the restrictions at issue here are within the scope of the patent, what they mean is that the goods that are being restricted are arguably encompassed by the patent and the restriction doesn't extend past the date when the patent expires. That's all they mean. And if that were the exclusive test, the defendants in Masonite, in New Wrinkle, in Line Material, they would all have been off the hook, because all of those cases involved restrictions on trade in patented goods during the period that the patent was in effect, and yet the Court found antitrust liability in each of these. Now, the way that Respondent tries to explain Masonite, for example, Masonite involved a resale price maintenance agreement in which the patent holder sold goods and then attempted to control the price at which they would be resold. And the Court said that under the rule of patent exhaustion, the patent holder didn't have the right to do that, and therefore the patent laws provided no shield, and the agreement was held to be a violation of the antitrust laws. Now, Respondents say, well, that's consistent with their theory, because the restriction imposed went beyond the scope of the patent, because the right to control resale is not one of the rights that the Patent Act confers. But if that's the test for whether a restriction is within the scope of the patent, then we would say that it's not met here, because there's nothing in the Patent Act that says you can pay your competitor not to engage in conduct that you believe to be infringing. And really that's the thrust of their position, that if you have — if a patent holder has a non-SHAM allegation that a particular mode of competition would be an infringement of its patent, the patent holder can pay the competitor not to engage in that competition. Again, we're not talking about conduct in which there's been any judicial determination that infringement has occurred. We're just talking about cases in which the patent holder has a non-SHAM allegation that infringement would occur. And it's the case that the patent holder has a non-SHAM allegation that infringement has occurred, and it's the case that at the time of the Shearing Plough case, it was also before the Eleventh Circuit, that the government was not taking the position it is now taking. Stewart. The FTC has consistently taken this position. The Department of Justice, up until 2009, we didn't endorse the scope of the patent test. Indeed, in our invitation brief in Joblob, we specifically said that the scope of the patent test was — didn't provide for enough scrutiny of these settlements. But what we advocated, what the Department of Justice advocated instead was a test that would focus on the strength and scope of the patent, that is, the likelihood that the brand name would ultimately have prevailed if the suit had been litigated to judgment. And in 2009, for the first time in an amicus brief filed in the Second Circuit, we took essentially the position that we're taking here, that is, that agreements of this sort should be treated as presumptively unlawful with the presumption that the patent has been able to be rebutted in various ways. And one way is to assess the validity or the strength of the infringement case? We would say that that's not a way, that the way the patent has been rebutted is unlawful. That's my concern, is your test is the same for a very weak patent as a very strong patent. That doesn't make a lot of sense. Well, the test is whether there has been a payment that would tend to skew the party's willingness for the generic to agree to an entry date later than the one that it would otherwise insist on. Now, it probably is the case that our test would have greater practical import in cases where the parties perceive the patent to be weak. But why wouldn't that determination itself reflect the strength or weakness of the patent so that the market forces it or take that into account? Well, I think in the kind of settlement that we would regard as legitimate, where the parties simply agreed to a compromised date of generic entry, then the parties would certainly take into account their own assessment of what would likely happen at the end of the suit. And so if the parties believe that the brand name was likely to prevail, then if the brand name agreed to early generic entry at all, it would presumably be for a fairly small amount of time. Conversely, if the parties collectively believed that the generic, that the brand name had a weak case and the generic was likely to prevail, then they would negotiate for an earlier date. And the problem with the reverse payment is that it gives the generic an incentive to accept something other than competition as a means of earning money. I mean, to take another theory. This was not a problem, I gather, until the Hatch-Waxman amendments? These suits, these types of payments appear to be essentially unknown in other lawsuits and in other patent infringement cases. Scalia, and so do suits against this kind of payment. And I have the feeling that what happened is that Hatch-Waxman made a mistake. It did not foresee that it would produce this kind of payment. And in order to rectify the mistake, the FTC comes in and brings in a new interpretation of antitrust law that did not exist before, just to make up for the mistake that Hatch-Waxman made. Even though Congress has tried to cover its tracks in later amendments, right, which deter these payments. Congress has tried to reduce the incentives for these payments to be made. I mean, Professor, why should we overturn understood antitrust laws just to patch up a mistake that Hatch-Waxman made? Well, a couple of things I would say. First, I don't think we're not asking you to overturn established antitrust laws. To take another analogy, for example, if Watson, instead of developing a generic equivalent to Androgel, had developed an entirely new drug that it believed would be better than Androgel for the same conditions, and if Solvay had paid Watson not to seek FDA approval and not to seek the — to market the drug, I think everyone would agree that that was a per se antitrust violation, even though Watson's ultimate ability to market the new drug would depend on FDA approval that might or might not be granted. And so when we say it's unlawful to buy off uncertain competition, it's unlawful to buy off competition even when the competition might have been prevented by other means. We're just enforcing standard antitrust principles. To focus on the distinction between Hatch-Waxman and other patent litigation, Professor Hovenkamp's conclusion is that the reason that you don't see payments like this in the normal patent infringement suit is that in the typical market, if a patent holder were known to have paid a large sum of money to a competitor who had been making a challenge to the patent, if other competitors knew that that had happened, then they would perceive that to be a sign that the patent was weak and that they would leap in. But he says Hatch-Waxman makes it more difficult for that to be done because Hatch-Waxman gives unique incentives to the first paragraph for a filer. Kennedy, is that the 18-month rule primarily? It's a 6 — it's a 180-day period of exclusivity. I mean, 180 days, yes. Yeah. And the way it works is that the exclusivity period is not good in and of itself for consumers. That is, during the period when one generic is on the market and the others are not yet allowed to compete, you have essentially duopoly conditions, the price of the drop — of the drug drops, but only by a little bit. Congress granted the 180-day exclusivity period because it wanted generics to have ample incentives to challenge patents that were perceived to be weak. And if the first filer is able to essentially be bought off, is able to settle for something other than early entry into the marketplace, then other potential competitors face barriers to entry that they — similarly situated competitors wouldn't face in other industries. Breyer, that does seem that that's rather thin, I think. I don't know how. I don't have the ability to assess that and the significance of it empirically. The thing I wonder, therefore, is you said this is common in antitrust. I'm not up to everything in the field, but I know there's an existence of something called a per se rule. That's price fixing. I know there's a rule of reason. And I know there's a sort of vague area that sometimes in some cases that Justice Souter mentioned in California Dental, there's something slightly in between which, as I saw those cases, they're very much like price fixing or agreements not to enter. And what they seem to say is, Judge, pay attention to the Department when it says that these are very often can be anti-competitive, and ask the defendant why he's doing it. I mean, is that what you want us to say? It didn't seem, from your briefs, if you were, you were asking us to produce some kind of structure. I don't mean to be pejorative, but it's rigid. A whole set of complex per se burden of proof rules that I have never seen in other antitrust cases. My question is, when I say I've never seen anything like this before in terms of procedure, I want you to refer me to a case that will show, oh, no, I'm out of date. Well, the Court has recognized such a thing as the quick-look approach, but I think even though the case didn't use the term quick-look, I don't believe it did, NCAA v. Regents of University of Oklahoma is probably the best example where the Court of Appeals. Breyer, are there others? Well, that's the one I'm most familiar with. Is there any other? Are you familiar with any other? Because I want to be sure I read all of them. I'll need to look back and see. Well, if there are few or none, then I would say, why isn't the government satisfied with an opinion of this Court that says, yes, there can be serious anti-competitive effects? Yes, sometimes there are business justifications. So, Judge, keep that in mind. Ask him why he has this agreement. Ask him what his justification is. And see if there's a less restrictive alternative. In other words, it's up to the district court, as in many complex cases, to structure their case with advice from the attorneys. I think that would leave courts without guidance as to what factors would be appropriate in an appropriate case. The same thing is appropriate as is appropriate in any antitrust case. Are there anti-competitive effects? I have 32 briefs here that explain very clearly what you said in a sentence. It may be that they're simply dividing the monopoly profit. I understand that. You know, I can take that in, and so can every judge in the country. And what's complicated about that? And then I have some very nice dark green briefs that clearly say four instances, maybe five, where there would be offsetting justifications. I think they can get that, too. Well, certainly our proposed approach accounts for that. It provides really two different forms of rebuttal. First, our approach says this is on its face an agreement not to compete. The generic has agreed to stay out of the market for a defined period of time. And the payment gives rise to an inference that the delay that the generic has agreed to is longer than the period that would otherwise reflect its best assessment of its likelihood of success in the lawsuit. But then we say there are basically two different types of ways in which the presumption could be rebutted. First, the parties can show that the payment was not in consideration for delay, that there was some other commensurate value transferred, and the payment and that arrangement would have been entered into even without the larger settlement. And then second, we're at least accepting the possibility that brand names and generics could come in and say, even though our payment was for delay, even though we can't identify anything else that the payment could have been consideration for, it's still pro-competitive. Breyer. And they mention at least two others. The first one they mention is because the person who is already in the market thinks that the next year or two or three years is worth 100 million a year, and the person who is suing thinks it's worth 30 million a year. And so he says, hey, I have a great idea. I'll give him the 30 million and keep the 70. And that, I don't see why that's anti-competitive, if that's what's going on. And the second instance they bring up is that it's very hard to break into a market. So for the new generic to come in, he's thinking, giving me two years isn't worth much because I'll spend a lot of money. It's very hard for me to do it. But the defendant who wants this patent kept intact says, I will not only let you – I'll let you in a year earlier and I'll give you enough money so that you can start up a distribution system. The second seems pro-competitive. The first, neutral. The problem of deciding whether other matters are or are not really payments for something else, a true nightmare when you start talking about five drugs and different distribution systems. And the matter of whether you're paying for litigation costs, a matter of great debate for the judge. Okay? That's the arguments that they make. Go ahead. Stewart. Let me say a couple of things about the administrative nightmare. The first is that to the extent that these inquiries are difficult, they're difficult only because the brand names and the generics have made them difficult by tacking on additional transactions to their settlement proposal. And to take an analogy, there are government ethics rules that say that what are called prohibited sources, basically people who have business before the department, can't give me gifts as a government employee. Now, obviously it would be absurd to have a rule that said a prohibited source couldn't give me a Rolex watch, but could sell me a Rolex watch for a dollar. And so the ethics rules treat as a gift an exchange for value in which fair market value is not paid. And everybody understands that once you go down that route, occasionally you will have hard cases in which people could legitimately agree, was this a legitimate arms-length exchange or was it a concealed gift? But the prospect of those difficult cases doesn't mean that we get rid of the gift ban altogether. And certainly Federal employees couldn't bring the ethics office to its knees by engaging in such a proliferation of these side deals that the ethics office decided it's not worth it. The second thing is that Respondent's approach would apply even when there are no hard questions. Respondents would say that even if the agreement provides for delayed generic entry until the date the patent expires, and even if the only other term of the agreement is the brand name pays the generic a lot of money, that that would be a legitimate agreement because the restriction would apply to arguably patented drugs and it wouldn't extend beyond the date of patent expiration. I guess the other thing I would say about the way in which these payments can facilitate settlement really shows their anti-competitive potential. That is, suppose that the parties were negotiating for a compromised date of entry, but they couldn't agree. The brand name said beginning of 2017 is the earliest we'll let you in, and the generic said beginning of 2015 is the latest date that we would accept. Now, the Respondents used the term bridge the gap, but there's obviously no way that a payment from the brand name to the generic could enable the parties to agree on an entry date between 2015 and 2017. The brand name is never going to say, well, I would insist on holding out until 2017, but if I'm going to pay you a whole lot of money, then I'll let you in earlier and accept a diminution of your profits. The brand name is going to say, if I pay you money, I'm going to insist on deferring entry even later than the 2017 date that would otherwise be my preferred compromise. So the natural effect of these payments is not to facilitate a bridging the gap in the dates that the parties would otherwise insist on. It is going to be very likely to cause the parties to agree to an entry date that's even later than the one the brand name would otherwise find acceptable. Sotomayor, can we go back to Justice Breyer's question, initial question? It's rare that we find a per se antitrust violation. In most situations, we put it into rule of reason. You seem to be arguing that this is price fixing, a reverse payment like price fixing, so that it has to fall into something greater than the rule of reason. Not price fixing, but it's an agreement not to compete. That is, the parties are not agreeing as to the prices they will charge. The generic is agreeing to stay off the market first, but that would be treated as a per se violation. Well, why is the rule of reason so bad? And that's really my bottom line, because you're creating all the – I think that's what Justice Breyer was saying. I mean, for example, I have difficult understanding why the mere existence of a reverse payment is presumptuously gives – changes the burden from the plaintiff. It would seem to me that you'd have to bear the burden of proving that the state payment for services or the value given was too high. I don't know why it has to shift to the other side. Now, if you wanted to tweak the theory in that way and to say that in cases where there is not just a payment and an agreement on the date of market entry, but there is additional consideration exchanged beside, if you wanted to say that the plaintiff would bear the burden of showing that this was not a fair exchange for value, that that's not something we would agree with, but that would be a fairly minor tweak to our theory. Sotomayor So answer the more fundamental question. Why is the rule of reason so bad? Stewart The rule – I mean, it's bad for reasons both of administrability and it's bad conceptually. The reason it's bad for reasons of administrability is that at least I take what you're proposing to be that the antitrust court would consider all the factors that might bear on the assessment of the agreement, that those would include presumably the strength of the patent claim, the subjective order. Breyer No. It's – I mean, Professor Ireda, who is at least in my own mind a minor deity in this area, if not major, he explains it. He says, Don't try for more precision than you can get. The quality of proof required should vary with the circumstances. You know how long it took? I mean, and I – of course, I know a little bit of antitrust, but I mean, I think some – you know how long it takes to take in your basic argument that these sometimes can be a division of profit, a monopoly profit, takes probably 3 minutes or less? Judges can do that. So you say to the judge, Judge, this is what's relevant here. And there's a rule of evidence, don't waste the jury's time. So you shape the case as – and this is what used to go on for 40 years. You shape the case in light of the considerations that are actually relevant, useful, and provable in respect to that case. And district judges, that's their job. So what I'm – I'm not saying you lose the case. They didn't decide this in the Eleventh Circuit. They said there's no violation, okay? I've got your point on that, but I'm worried about creating some kind of administrative monster. Well, it's not a typical – I mean, the Court did this in NCAA, for example, where it said that the agreement it was looking at, which dealt with the allocation of rights to televised football games, was essentially a limitation on output. And the Court said those are presumptively unlawful. Long experience in the market has shown that they are suspect. The Court didn't say there was long experience in the market for television rights to football. It just said output limitations have been established as disfavored. Nevertheless, because competitive sports by nature require a degree of cooperation between the people who compete against each other to establish the rules of the game and so forth, we will look to see whether the parties have – whether the defendants have identified anything about their specific industry that would justify our decision not to apply the usual presumption. And it concluded that there was nothing there. And we're really asking the Court to take the same approach here. We're saying payments not to compete are generally disfavored. The parties can – when you have a hatchwaxman settlement in which money is passing from the brand name to the generic, it's an unusual settlement to begin with, because there's no way that the suit could have culminated in the generic receiving the money judgment. And therefore, we'll look upon this with suspicion, but we'll give the parties adequate opportunities to rebut. If I may, I'd like to reserve the balance of my time. Thank you, Mr. Stewart. Mr. Weinberger. Mr. Chief Justice, and may it please the Court, I'd like to first respond to a question that was asked of my friend by Justice Scalia a few minutes ago. He was asked if there are any cases in which the Court has ever found a restraint outside the scope of the patent to be unlawful. And the answer to that question is no, that all of the cases that have found violations of the antitrust laws based on a patent-based restraint do so because the object of the agreement, the restraint that is being achieved in the agreement, is beyond the scope that could be legitimately achieved with a patent. For example, it's an attempt to control downstream the resale prices of products that you cannot do simply by exercising your patent, or it's an attempt to control the sale of unpatented products that go beyond what a patent can protect. Every case in which Sotomayor Why isn't this that, meaning there is no presumption of infringement? There's no presumption that the item that someone else is going to sell necessarily infringes. That's correct. Sotomayor And so what you're arguing is that, in fact, a settlement of an infringement action is now creating that presumption. No, Justice Sotomayor, I'm not arguing that. But I do want to say that I think our patent system depends upon the notion that you don't evaluate from the perspective of the antitrust laws a patent restraint based upon whether you could have proved in a litigation that that patent, that the patent was infringed. Sotomayor I don't know, but I don't know why we would be required to accept that there has or would be infringement by the product that has voluntarily decided not to pursue its rights. I think you're not accepting infringement. What you're doing is recognizing there is a reasonable basis to assert the patent, a bona fide, reasonable dispute, and the parties have the ability to settle that dispute. Just as if the party, if someone was entering into a license agreement with someone who had a product that they claim did not infringe the patent, they sat down, negotiated a license, resolved it. Sotomayor But there you know that they are not sharing profits. Sotomayor Yes. Sotomayor Meaning there you know that a product has been licensed and that's normal. The infringer is now paying the other side money to sell that product. Sotomayor But, Justice Sotomayor, many others. Sotomayor A reverse payment suggests something different, that they are sharing profits. I don't know what else you can conclude. Sotomayor Many license, I don't think that's correct, and that's because many license disputes are, in fact, resolved by the alleged infringer exiting the market for a period of time or agreeing to stay off until a certain time, and then the license kicks in. Sotomayor How many are reverse payments? Sotomayor Yes, they are, because, for example, there could be a license agreement where the infringer agrees to stay off the market for X number of years, and when it comes on, it pays a certain royalty. Now, anybody could argue that that royalty, if it were higher, could result in an earlier entry. There's always an argument to be made with any delayed entry situation that Monopoly profits are shared. That's just inherent in the nature of it, and if you take the FTC's argument to its full force, it would mean that any situation where anyone is agreeing to a delayed entry and there's any other value that's being exchanged in that situation, that, in effect, in economic terms, is a payment for delayed entry. There's no difference. Breyer. Yeah, but their point is not it's per se unlawful. What they want is they want to cut some kind of line between a per se rule and the kitchen sink. And if you look at the brief supporting you, it is the kitchen sink. You have economists attacking the patent system or praising it, da, da, da, here and there and the other. They don't want the kitchen sink. Now, suppose I don't want the kitchen sink, but I have a hard time saying what the per se rule is. So what's your idea? I have obviously given a lot of thought to whether there is any kind of an intermediary test that works, and I don't believe there is. Let me explain why. First, you can't really measure whether there are any anti-competitive effects from such a settlement agreement without determining what would have happened if the case hadn't settled and would have been litigated. And if the patentee had won the litigation, then there would be no anti-competitive effects. That's what the Second Circuit and the Federal Circuit concluded in applying a rule of reason test and saying the first condition of such a test has not been met, because there is no demonstration of anti-competitive effects. And the cases, both of those cases are very good illustrations of what I'm talking about. Those were the Tamoxifen and Cipro cases, where the parties agreed to so-called reverse payment settlements that FTC would say are basically, per se, unlawful. Kennedy, would it help if you were thinking about rules and caps to consider not what the branding company would have made, but what the generic company would have lost, and use the latter as the limit? Well, you really don't know unless you can assume when they could have entered. You have to make an extrapolation, yes. Because it all depends on what would have happened in the patent litigation. So that you can't really tell whether there's any anti-competitive effect. I shall say with respect to the generic losing, there's really no risk for the generic here, which is one of the reasons you see these settlements, that in this industry But if the generic wins, though, it's — everybody's profits are lower. And you can gear it to just what the generic would have made. They're lower than they would be under some other situation. But the patent gave the patent holder the legal right to exclude. And so unless there's a reason, there's some reason to believe that it couldn't reasonably assert that patent, it's entitled to monopoly profits for the whole duration of the patent. Mr. Weinberger, can I just understand what you're saying and maybe do it through a hypothetical? So suppose you had a lawsuit, and the generic sends the brand name manufacturer an e-mail. And the e-mail says, we have this lawsuit. I think I have about a 50 percent chance of winning. If I win, I take your monopoly profits down from $100 million to $10 million. Wouldn't it be a good thing if you just gave me $25 million, all right? And then the brand name sends an e-mail back, says, you know, that seems like a pretty good idea, so I'll give you $25 million. Now, as I understand it, your argument is, I mean, that's just fine. That's hunky-dory. What I'm saying is that in any given situation, the parties that are in the situation   assert that patent, and in truth, if the patent had what you say is a 50-50 chance of prevailing, then I think that there could be a settlement like that if it's in good faith. Even though — but what does that mean, in good faith? It's clear what's going on here, is that they're splitting monopoly profits, and the person who's going to be injured are all the consumers out there. Any situation in which there's any — in any patent dispute in which there's a tradeoff like the examples I mentioned before of time for value, could — that argument could be made. And, in fact, if that was true, if it was true that the natural inference and the motivations of people were simply to divide these profits with no other consideration, then what you'd expect to see is that every single patent dispute would — especially in Hatch-Waxman — would result in a settlement that just pays the generic until the end of the patent, because, after all, the market would be— Kagan Well, Mr. Weinberger, I think if we give you the rule that you're suggesting we give you, that is going to be the outcome, because this is going to be the incentive of both the generic and the brand-name manufacturer in every single case, is to split monopoly profits in this way to the detriment of all consumers. Weinberger Let me address that, Your Honor. I don't think that's realistic at all, because — and let's take this industry specifically — that the ability to challenge a patent in this industry is lower than any industry that I can think of. And that's because a generic is given the right to certify against a patent and then basically challenge the patent without having actually developed the product, gotten a marketing force, gotten a factory, putting the product on sale, and taking the risk that everyone else who challenges a patent has to take. All they have to do is file an ANDA, which is roughly $300,000 to $1 million. For these size drugs, that's not a lot, and certify. And the FTC's own studies have shown that it takes a very small chance of winning, something like 4 percent for a drug over $130 billion, to justify a generic suing a brand-name company. And what happens — what happens in these cases— Sotomayor, in all cases, or just Hatch-Waxman cases? It's Hatch-Waxman cases. It's because— Sotomayor, it does skew the dynamics a lot. Yes. You know, the Second Circuit recognized, even though it accepted your scope of the patent, that there was a troubling dynamic in what you're arguing, which is that the less sound the patent, the more you're going to hurt consumers, because those are the cases where the payoff, the sharing of profits, is the greatest inducement for the patent holder. The Second Circuit recognized that, but then they said, on further reflection, on further consideration of this, we are not troubled by it. And one of the reasons they were not troubled, and it's what I was trying to answer Justice Kagan about, is because the reality of the situation is, with so many potential challenges to the patent, all they have to do is file an ANDA. There are 200 generic companies in this industry that, if you try to adopt that strategy of paying the profits of a generic, there's going to be a long line of supplicants. Sotomayor, I don't think that that's true, Mr. Weinberger, and it's because of something that Justice Scalia suggested, is that there's a kind of glitch in Hatch-Waxman, and the glitch is that the 180 days goes to the first filer. And once the 180-day first filer is bought off, nobody else has the incentive to do this. That's clearly not correct, either by logic or by reference to actual experience. It's true that the first filer is given a greater incentive, but these products can last for 20 or 25 years. But the huge percentage of the profits is done in the exclusivity period. I mean, it's true that it can go on for a long time, but you're making dribs and drabs of money for a long time. Where you're really making your money is in the 180 days. Experience doesn't show that, because if you look at Hatch-Waxman litigation, we've cited in the red brief, and it's been discussed by the antitrust economists and the Generic Pharmaceutical Association in their antitrust brief, that many of these Hatch-Waxman cases involve multiple filers. You have 5, 10, as many as 16 companies challenging these patents, all of one of whom are not the first filer. So there must be an incentive for them to do this, and they are. So I think experience says that that kind of extreme view of incentives is not really true. Kennedy, what do we look at to verify what you say? Is that all in the briefs? Yes. It's in the Solveig brief. I don't have the page. Because I had thought, as Justice Kagan's question might indicate, that the 180 days is crucial. It allows you to go to the doctors, to give them the name of your generic equivalent, et cetera, and that that's a big advantage. Now you're indicating that it isn't? It's a big advantage. It's an incentive for the first 6 months. I don't debate that. But after that, the market opens up. Okay. Suppose this sounds like an argument, discussion, that you'd have in a district court. So why — what's your reaction to this? Say, A, sometimes these settlements can be very anti-competitive, dividing monopoly profit. In deciding whether anti-competitive outweighs business practices without less restrictive alternatives, Judge, you may take that into account. Two, do not take into account the strength of the patent. Three, do not try to relitigate the patent. Four, there are several possible justifications. Ones I listed before out of the briefs. You know, litigation costs, the helping them in, other products, different assessments of value. Five, there could be, in fact, no anti-competitive effect here because of what you just said now in response to Justice Kennedy and Justice Kagan, but there could be. We don't know. Okay? So start with where we were. Could be anti-competitive. Give the defense a chance to go through five, one through five. And if they convince you there is a six, we're not saying there isn't, but we can't think of one on the briefs, let them have the six, too. Okay? Now, Judge, weigh and decide. That's what we do. So we've structured it somewhat to keep the kitchen sink out on the basis of the briefs given to us. What's wrong with that? Well, I think the first problem with it is that it's very unpredictable. It's really hard to figure out how that all gets sorted out. And the parties who are sitting down to do a settlement need, I feel, much clearer guidance as to whether they can't. You can't possibly figure it out, can you, without assessing the strength of the patent? That's right. Isn't that crucial to the conclusion? I believe that the only thing a broadcaster can do is to assess the strength of the patent, is to leave out the elephant in the room. I agree with that, Justice Scalia. I don't think that an alternative test, the only alternative test that could be fashioned that would make sense is one based on strength of the patent. But there are so many reasons that that is an undesirable result that I don't think it's the way this Court should go. And for whom? And, you know, the government is basically saying we really don't want reverse payments, period. We want people to settle this the way they should settle it, which is on the strength of the patent. And that means settling it simply by either paying a royalty for use or settling, as most cases do, on an early entry alone. So there's no sharing of profits. It's so bad about that. Sotomayor, I mean, it doesn't deprive either side of the ability to finish the litigation if they want to? Well, let's take the — I'm not — I wouldn't concede that most cases settle like that. But let's accept that and take the case of a strong patent or a patent with a long term. Let's say it has — you evaluate the strength of the patent and you conclude that it has 10 or 15 good years remaining. Now you have a generic who is — or many generics who have sued with no risk or minimal risk in Hatch-Waxman, and their response is, why would I — why would I drop this lawsuit to get an entry date in 2025 or 2028? It doesn't meet my business needs. I have shareholders, I have investors, I have to run a business, and I'm going to keep on litigating unless you give me something of value. So that's what these agreements are about. They're saying, well, what other — remember, this is not just a cash payment. They're rule covers. Well, of course, if the patent's really strong, if you get a year or two earlier entry, that has an inherent value, and that's what you'll pay for, is what the government is saying. That will be the determination the two parties will make, which is at what point is earlier entry worth it for the very strong patent holder. But, first of all — but, first of all, parties often don't agree on the merits. Parties tend to be overconfident. They both think they're going to win. So it's sometimes very hard to come to a consensus where entry date is the only bargaining chip available. Sotomayor Well, they pointed to most settlements and say that's the vast majority. I don't know where the evidence would be for that. I don't think — Sotomayor Well, you know that these reverse payments, except for recent times when people figured out they were so valuable, were the exception, not the rule. Actually, we have 10 years of experience since the circuit courts first began applying scope of the patent test to these settlements, since 2003. So we have a pretty good window as to what would happen. Sotomayor They've been increasing in number, not decreasing. Sotomayor No, I think they've been actually very steady. They're roughly between 25 and 30 percent, pretty much constant. And you don't really see any huge blips, depending on what a particular court is ruling. If the FTC's kind of the sky is going to fall approach is right, everybody's going to run out and do this, you would have thought that after the First Eleventh Circuit ruling, after the Federal Circuit ruling, after the Second Circuit ruling, after the Second Eleventh Circuit ruling, that there would be huge increases in this, but we haven't seen that. Some of the numbers increased last year, but as a percentage of the total settlements, they're very steady. They're pretty much the same. Ginsburg What about the consideration that seems to be driving the government, that is, the generic is getting an offer that they would never get on the street? I mean, they are being paid much more than they would get if they won the patent infringement suit. If they won the patent infringement suit, then they can sell their generic in competition with the brand. But under this agreement, they get more than they would get by winning the lawsuit. Kennedy Just, Ginsburg, first of all, every settlement agreement involving one of these cases must be filed with the FTC. They have hundreds of them, and they haven't pointed to a single example where that's the case. Sotomayor But it's just that the knowledge is large. Kennedy Suppose that hypothetical is correct. That's my concern, too. What the brand company can lose is much greater than what the generic can make. So why don't you just put a cap on what the generic can make, and then we won't have a real concern with the restrained trade, or we'll have a lesser concern. I think that's the thrust of Justice Ginsburg's question, and it's my concern as well. Sotomayor Yes. And I want to make clear that I don't think that could happen, because if a brand name company adopted that as a strategy to protect its patent, it would be held up. It would be held up by the many generic companies that could easily challenge these patents without actually having a manufactured product, without putting it on sale, et cetera. So I think that the antitrust rules should not be fashioned to deal with a case on the extreme, which hasn't been shown to happen, which logically, from an economic point of view, is highly unlikely to happen. And if for some reason that starts happening empirically, then Congress, and if there's a loophole in Hatch-Waxman that is causing that, and there's really no evidence that that extreme example has happened, then Congress can deal with it, just as it dealt with the exclusivity provisions. Ginsburg I thought the government was telling us that that's this case, that the — what the generic is being offered in the way of sharing the monopoly profits is more than it could ever make if it won its suit and sold its drug. Kennedy Well, I don't see any examples of that cited in their brief. It's a theory. It's a hypothetical theory, but there's no data. We've had years of experience. Kennedy Well, but it's not hypothetical that if the generic wins, the brand company's profits are going to go way, way down right away, and the generic profits are not going to be that great. Of course. I think that's true in many, many patent litigations. Kennedy But so then the question still holds. If you key your payment to what the brand company will make, it's just a much higher figure and a greater danger of unreasonable restraint. There is that hypothetical risk, what I'm — I hope I'm trying to make the point that it's not — with the number of challengers you have here, which is basically unlimited, that if you put a sign on your — around your neck that says, paying off all generic companies their profits, whoever wants to challenge my patent, come do it, there's going to be a long line of people, of companies, paying. Kennedy Okay. I will grant you that point that the 180 days is not that big a difference, and that there are many generics out there. But isn't that true in every industry? You said at the outset, oh, well, now in the drug industry there are a lot of people ready to pounce in. Isn't that true in any industry? Sotomayor It is true, and that's why it doesn't happen. It's — it's more true here because it's much easier to challenge a patent. So in any other industry, a potential challenger has to make a major investment in a product, has to get it manufactured, has to put it on sale, and then litigate. And if they lose, they're going to be liable for enormous damages. That's not the case. That's not the case under Hatch-Waxman. All they need to do is file an AMDA, they have nothing at risk. If they lose, they haven't lost any damages, they just walk away. So there is an enormous difference in the risks between Hatch-Waxman and other cases that explains the particular form of some of these settlements, of why they happen. Sotomayor I see that as an argument, that there is an economic reality in Hatch-Waxman that would require us not to apply any rule we choose or accept here to other situations, only here. That's the argument that you're creating for me, that there's a different economic reality here. But that requires a different rule. Justice Sotomayor, I think the economic reality cuts the other way. It doesn't cut in favor of making a rule that makes these more difficult. What I'm saying is that there — Oh, but it does, because in Hatch-Waxman, Congress decided that there was a benefit for generics entering without suffering a potential loss, to enter the market more quickly. Justice Sotomayor, I don't think the legislation — And any settlement in these cases deprives consumers of the potential of having the benefit of an earlier entry. I don't believe there's anything in Hatch-Waxman that supports the idea that the purpose was to provide for generic entry prior to patent expiration. What the structure is designed to do is encourage challenges. Exactly. And it's not a— And that's what you're doing with permitting settlements of this kind is not permitting the process to go to conclusion. I don't think there's anything in Hatch-Waxman that suggests in any way that settlements are — should be discouraged or that cases should be mandated to proceed to judgment or that all have to be litigated. It's encouraging infringements. It's encouraging challenges. And it has produced many challenges. And I can say that — can I say that with 10 years of application of the scope of the Hatch-Waxman, it's working very well. The amount of — the number of drugs that have now gone generic from just 10 years ago to today has increased enormously. So why does it help you to say that if the court says, or the FTC says, when you get one of these suits, you can settle it by letting them in, but you can't pay the money. That will help to stop strike suits if it really costs them nothing to get in. They're going to have to really want to enter or they won't bring the lawsuit. So why does that hurt you? Well, I actually think that you raise a point that the generic — in some of the amicus briefs, some of the generic parties have talked about, which is that their ability to challenge these cases depend on their not having to litigate every one of them to conclusion. And that's not bad, because most patent cases settle. Most of these disputes settle. And if our system was one in which every case had to be litigated fully to judgment, we've been unable to cope with that. So what the — I think the statute mandates or contemplates is that generics should be able to challenge and should have strong incentives to challenge, but that doesn't mean that they should be required to litigate to conclusion. And if settlement is made more difficult so that different perceptions or different business objectives can't be bridged with some kind of a business settlement, that's going to mean that fewer generics are going to challenge these patents. And that is contrary to the purpose of the Hatch-Schweppes. Kennedy. I think it's correct that to develop a new drug, sometimes you need not just scientists and attorneys, you need investment bankers. You then need marketers, because the cost of these drugs can be hundreds of millions. Is there anything in the record that shows the development cost of this drug? This particular drug, I don't know. I mean, there are lots of studies on how much average drugs cost. And that figure is over a billion dollars. It can be a billion. Easily a billion dollars. Anything in this case? This particular drug I don't know. Anything in the record? No, because we were on a 12B6 motion, on a motion to dismiss, so none of that was really developed. But I'm sorry. I was just going to say that, of course, any given drug development cost doesn't even begin to tell the picture, because for every drug that succeeds, there are at least ten that fail. And all the costs that are involved in the drugs that fail have to be covered with the one drug that succeeds. Could I just make sure I understand the way the 180-day period works? The first filer gets it. If I buy off the one brand name manufacturer and I buy off the first filer with one of these reverse payments, you're suggesting that that's not going to do me much good, because there are all going to be, there's going to be a long line. And that long line of people, it's not just that they don't get the 180-day period, is it? It's like even if one of those people wins, the person whom I've paid off is going to get the 180-day exclusivity period, isn't that right? Not completely. First of all, it depends on the agreement. For example, in this case, that 180-day exclusivity was waived. So it's not just like I don't get it, so my incentives go down, it's that my competitor gets it. So why in the world am I standing in line to challenge this if my competitor is going to get the exclusive period? This was the exact problem that Congress addressed in 2003 when it amended Hatch-Waxman and changed the exclusivity requirements. So the way the law now reads is that subsequent generics, subsequent filers can trigger that 180-day exclusivity by continuing to litigate. So if the first filer settles and these other folks are in line and they're litigating, they can force that period to start running and then they can come in right after. So it is not correct that you can tie up the first filer in a settlement and prevent everybody else from entering. And even before that amendment, the Eleventh Circuit, Federal Circuit and Second, applying the scope of the patent, will recognize that if the agreement creates a bottleneck to other filers that goes beyond what the statutory exclusivity provides, where they agree not to give up their exclusivity or agree to retain it, then that's beyond the scope of the patent, because you can't achieve that kind of restraint simply with a patent. You're using the agreement to expand upon your patent rights to block other filers. So I think that problem has been addressed by Congress. And if somebody feels that solution is not perfect and they want to make it even easier for subsequent filers to come in, then I submit that Congress can do that. That they are going to do that. What was the change that was made? The change that was made, Justice Ginsburg, is that there were a number of changes, but the one that's relevant here is that if a subsequent filer strikes, you can trigger the exclusivity beginning to run by getting a judgment. So in the past, if a first filer settled and they just didn't do anything, may I finish the answer? And they just didn't do anything, that would prevent other generics from coming to market. But now, anybody else who's litigating this patent, if they go ahead and win their case, then that triggers the first filer's rights. And if they don't exercise those rights within 75 days, they're gone, they're forfeited. So that's the change. Thank you. Roberts. And Mr. Stewart, you have 5 minutes remaining. Thank you. Mr. Weinberger argued that in order to determine whether a settlement of this sort has anti-competitive effects, we would have to know how the lawsuit would have turned out. But it's perhaps the most fundamental principle of antitrust law, that particular conduct can be legal or illegal depending on the deliberative process that led up to it. And to put that in concrete terms, if a business charges a particular price for a particular product because it's made the assessment that this will maximize profits in a competitive environment, that decision is almost immune from antitrust scrutiny. But if the business charges the same price for the same product in the same market because it's agreed with its competitor that it will charge that price, that's a per se antitrust violation. So it's not at all anomalous to say that this type of agreement can be deemed anti-competitive even though the same result, namely exclusion of the generic from the market, might have been able to be obtained by other means. The second thing is, Mr. Weinberger said there are instances in which second and successive filers will attempt to challenge the brand name even after the first filer has been bought off. I think we disagreed that it's as easy as he would say it is, but we'll concede it happens occasionally. But the fact that particular anti-competitive conduct doesn't always work doesn't make it lawful. It could often happen that two firms were thinking about entering into a price-fixing agreement, for instance, but thought to themselves, if we do that, there's a third firm, this would make our agreement unprofitable. And it might happen sometimes that two firms try to proceed with a price-fixing conspiracy, but they're thwarted because of the unexpected competition from a third firm. Roberts. Well, I thought Mr. Weinberger's point was that this is always going to happen, because it's very easy. As he said, you put a sign on your neck saying, generics line up to get your payment. That seems quite different than saying there's another firm out there in the abstract that might want to enter into a similar market-sharing arrangement. This is a very different system. I mean, first, there certainly is no evidence suggesting that it has happened often, although there is evidence that it has happened. But if the brand name perceived on a systemic basis that the likely result of paying off one competitor was that another competitor would step in and couldn't be bought off, would litigate the suit to judgment, there would be no incentive to make the reverse payment in the first place. That is, in making the reverse payment, what the brand name is attempting to purchase is protection from the possibility that it will have its patent invalidated and it will suffer a large competitive advantage. If a brand name thinks in a particular instance there's somebody else who's going to expose it to me to that risk, the payment wouldn't be expected to be made. So at least to the extent that it's not going to be made, it's not going to be made. And what's your understanding of why there would not be a long line in some cases or in many cases? I think for the reasons that your question suggested, that there is the 180-day exclusivity period, and leaving aside the cases in which that is waived, subsequent manufacturers would realize not only that they wouldn't get that period of heightened profits themselves, but they would have to wait in line for others, and they might focus their attention on other patents that were perceived to be weak as to which they could hope to get the 180-day exit. And is there anything to show what I think Justice Kennedy asked, you know, how much of one's profits comes from the 180-day period as opposed to what happens after that? No, it is the great majority. I don't have a percentage figure. And the reason, as I indicated earlier, was that during the 180-day exclusivity period, you have only two competitors, basically a biopoly arrangement. And my understanding is that the generics would usually charge around 80 to 85 percent of the brand name's price during that period, and after there is full competition, the price would drop to a fraction of that. The next thing I would say is that our system encourages settlement, but not to the nth degree. And so, for instance, if you had two firms fighting over a million dollars and each firm decided internally, 600,000 is the least I will accept, if they stuck to their guns, the case couldn't be settled. Now, if the public could be made to kick in an additional 200,000, then each of the firms could get at 600,000 and walk away content. But we don't pursue the policy in favor of settlement to that degree. But that's essentially what's happening here. The way these payments facilitate settlement is by inducing the generics to agree to a later entry date, by increasing the total pool of profits that are available to the two firms combined, and thereby maximizing the likelihood that each firm will find its own share of the profit satisfactory. And the last thing I would say is I think everyone who comes to this issue recognizes that there is a conundrum. Our natural instinct is to compare the settlement to the expected outcome of litigation, but everyone also recognizes that it just isn't feasible to try the patent suit. And therefore, our approach focuses on whether the competitive process has been preserved. Roberts. Thank you, counsel. Counsel. The case is submitted.